# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01076-PAB

ROCKY MOUNTAIN GUN OWNERS, et al.
   Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,
   Defendant.

---

## THE GOVERNOR'S OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION [DOC. 10]

---

   More Coloradans die from firearms than from car crashes or opioid overdoses. Some of those deaths, both by homicide and suicide, are caused by individuals purchasing a gun to immediately use in a moment of passion. To reduce these avoidable deaths, Colorado enacted a three-day waiting period between purchasing and receiving a commercially sold firearm. A study has found that such waiting periods can reduce firearm homicides and suicides between 7 and 17 percent. In Colorado, this translates to saving over a hundred lives every year.

   Plaintiffs seek to enjoin this law before it goes into effect on October 1. But they cannot meet their burden to justify this extraordinary remedy. The plain text of the Second Amendment covers the possession ("keep") and carrying ("bear") of arms. A waiting period affects neither right. Plaintiffs seek to read an implied right-to-acquire firearms on demand into the Second Amendment, but the Supreme Court has expressly limited the Amendment's scope to its plain text. The Court has also clarified that the Second Amendment does not extend to certain areas governments have historically regulated, including commercial sales. And even if Colorado's waiting period law impacted Second Amendment interests, laws aimed at preventing impulsive

use of firearms to protect public safety are nothing new in our nation's history and so are consistent with the Amendment. Plaintiffs' motion for preliminary injunction should be denied.

## BACKGROUND

On April 28, 2023, the Governor signed House Bill 23-1219 into law. *See* Ex. 1. The Act makes it unlawful for any person who sells a firearm to deliver it for three days or until the required background checks are complete, whichever is later. *See id.* § 2. A seller who violates the waiting period commits a civil infraction that carries a fine but no imprisonment. *See id.* The Act does not regulate purchasers. There are exceptions to the waiting period, including for firearm transfers that do not require a background check. *See id.* This includes, among other things, gifts between immediate family members and certain temporary transfers of firearms. *See* Colo. Rev. Stat. § 18-12-112(6). The Act will take effect on October 1, 2023. Ex. 1, § 3.

In enacting the law, the Colorado General Assembly found that "[d]elaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." *Id.* § 1(2)(a). The General Assembly recognized that Colorado has recently seen peaks in its firearm-related homicides and that Colorado ranks seventh nationally in terms of suicide by firearm. *Id.* § 1(1)(c), (d). The Act cites a study finding that mandatory waiting periods have led to a 7 – 11% reduction in firearm-related suicides and a 17% reduction in firearm homicides. *Id.* § 1(1)(f).

Colorado's three-day waiting period is the shortest of any state that has a waiting period. (Florida and Illinois both also have three-day waiting periods. *See* Fla. Stat. § 790.0655(1)(a); 720 Ill. Comp. Stat. 5/24-3(A)(g)). Several states have longer waiting periods. *See* Minn. Stat. § 624.7132 (eff. 8/1/23) (30 days for handguns, assault weapons); Haw. Rev. Stat. § 134-2(a), (e)

(14 days for all firearms); Wash. Rev. Code § 9.41.092(2) (10 business days for semiautomatic rifles); Cal. Penal Code § 26815(a) (10 days for all firearms); D.C. Code § 22-4508 (10 days for all firearms); R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a) (7 days for all firearms); Md. Code Ann., Pub. Safety, § 5-123(a) (7 days for handguns); N.J. Stat. Ann. § 2c:58-2(a)(5)(a) (7 days for handguns).

Plaintiffs Alicia Garcia and Rocky Mountain Gun Owners filed this complaint the same day the Act was signed. They moved for a preliminary injunction on June 7, 2023.[1]

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" granted only where a plaintiff establishes a "clear and unequivocal" right to relief. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). To meet its burden, a plaintiff must establish (1) that they have a substantial likelihood of success on the merits, (2) that they will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury outweighs the injury caused by the injunction, and (4) that an injunction is not adverse to the public interest. *Free the Nipple-Ft. Collins v. City of Ft. Collins*, 916 F.3d 792, 797 (10th Cir.

---

[1] The Governor, sued here in his official capacity, enjoys Eleventh Amendment immunity from any claims for prospective relief because he does not "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quotations omitted); *see also Ex parte Young*, 209 U.S. 123, 157 (1908). However, for the purpose of defending the Act from Plaintiffs' claims for declaratory and injunctive relief, the Governor agrees to waive his sovereign immunity and consents to be sued in this Court, only in this case, only in his official capacity, and only for prospective relief. *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

2019). The last two factors merge when the defendant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs' requested injunction is disfavored because it seeks "substantially all the relief [Plaintiffs] could feasibly attain after a full trial on the merits." *Sgaggio v. Weiser*, No. 22-cv-01791-PAB, 2022 WL 3700723, at *2 (D. Colo. Aug. 26, 2022) (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir 2005)). Accordingly, Plaintiffs "must make a strong showing with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations omitted).

## ARGUMENT

**I.    Plaintiffs cannot show a likelihood of success on the merits under *Bruen*'s two-step approach.**

### A.    Colorado's waiting period law satisfies the framework from *Heller, McDonald*, and *Bruen*.

In 2008, the Supreme Court held "that the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). But "[o]f course, the right [is] not unlimited." *Id.* "[I]ndividual self-defense is 'the central component' of the Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599) (emphasis omitted). Accordingly, the *Heller* Court was careful to acknowledge that it should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786.

Last year, the Court established a two-step framework to resolve Second Amendment challenges in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). At the first step, the Court considers whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129-30. If it does, the Second Amendment "presumptively protects that conduct." *Id.* The burden then falls on the government at the second step to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Two justices concurred specifically to emphasize that "laws imposing conditions and qualifications on the commercial sale of arms" remain valid. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27).

**B.    The Second Amendment's plain text does not cover Colorado's waiting period law.**

**1.    Colorado's waiting period does not implicate the plain text of the Second Amendment because it does not affect Plaintiffs' rights to "keep and bear Arms."**

HB 23-1219 is a regulation on the commercial sales of firearms that does not implicate the plain text of the Second Amendment. The "substance" of the Second Amendment right is "to keep and bear Arms." *Heller*, 554 U.S. at 581. The *Heller* Court considered the plain meaning of both "keep" and "bear," neither of which are implicated by Colorado's waiting period law.

Plaintiffs do not argue, nor could they, that the Act infringes their right to "bear Arms." That phrase "has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* at 584. The Act plainly doesn't affect this right at all.

Plaintiffs instead argue that the Act infringes their right to "keep Arms." *See* Doc. 10 at 5. But that right is focused on possession: historically, "'[k]eep arms' was simply a common way of referring to possessing arms[.]" *Heller*, 554 U.S. at 583. The Act does not bar anyone from

possessing arms. No Coloradans will be deprived of possessing their weapons by the Act. It removes no firearms from anyone's possession. It places no limits or regulations on the firearms that are kept by an individual. Unlike the laws at issue in *Heller* and *McDonald*, which precluded individuals from keeping handguns in their homes, the Act imposes no such restriction.

Plaintiffs instead suggest that "[t]he right to keep arms necessarily implies the right to acquire arms. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct—i.e., acquiring bearable arms—'the Constitution presumptively protects that conduct.'" Doc. 10 at 5 (quoting *Bruen*, 142 S. Ct. at 2126).

Plaintiffs' argument is contrary to *Bruen*. The Court was clear: courts must determine whether "the Second Amendment's *plain text* covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129-30 (emphasis added). Plaintiffs' focus on implied rights necessarily disregards the actual text of the Second Amendment. Nowhere in the Court's Second Amendment jurisprudence has it endorsed such a disregard for the Amendment's plain text or the creation of implied rights. *See, e.g.*, *Bruen*, 142 S. Ct. at 2127 ("In *Heller*, we began with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language.") (quoting *Heller*, 554 U.S. at 576-77). To the contrary, *Bruen* repeatedly stressed the importance of the Second Amendment's actual text (emphases added):

- "In keeping with *Heller*, we hold that when the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126.

- "When the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30.

- "We therefore turn to whether the *plain text* of the Second Amendment protects . . . carrying handguns publicly for self-defense." *Id.* at 2134.

- "Nothing in the *Second Amendment's text* draws a home/public distinction with respect to the right to keep and bear arms." *Id.*

- "The Second Amendment's *plain text* thus presumptively guarantees petitioners . . . a right to 'bear' arms in public for self-defense." *Id.* at 2135.

- "[T]he Second Amendment's *bare text* covers petitioners' public carry[.]" *Id.* at 2141 n.11.

Plaintiffs cite no cases, let alone post-*Bruen* cases, finding an implied right to acquire firearms on demand in the Second Amendment. A recent decision from the Central District of California rejected a nearly identical argument that the Second Amendment "implicitly includes the right to acquire . . . firearms" as inconsistent with *Bruen*. *Defense Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (such an argument "is quite-clearly not a 'plain text' analysis, required under *Bruen*."). Here, by labeling the so-called "right to acquire" firearms an "implied right," Plaintiffs concede that the right is not found in the plain text of the Second Amendment. This alone dooms their claim under *Bruen*.

### 2. The Act regulates the commercial sale of arms, a sphere in which states can lawfully use their police powers.

Plaintiffs' challenge also fails at *Bruen*'s first step because, as a regulation on commercial firearm sales, the Act is a firearm regulation the Supreme Court has recognized as "presumptively lawful." *Heller*, 554 U.S. at 627 n. 26. "*Bruen*, *McDonald*, and *Heller* preserved the idea that the government could '[impose] conditions and qualifications on the commercial sale of arms.'" *United States v. Marique*, --- F. Supp. 3d ---, 2022 WL 17822443, at *2 (D. Md.

2022) (quoting *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring)). This "makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession." *Id.* (quoting *United States v. Price*, No. 2:22-cr-00097, 2022 WL 6968457, at *2 (S.D. W. Va., Oct. 12, 2022)); *see also United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("the natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted.").

The Act does not regulate Plaintiff Garcia's conduct or any other firearm owner's conduct. First, it imposes civil penalties on a firearms seller if the seller delivers a firearm before the end of the waiting period. Ex. 1, § 2 (§ 18-12-115(1)). This demonstrates that the law regulates commercial sales, not an owner's conduct. In a pre-*Bruen* challenge to California's ten-day waiting period, one Ninth Circuit judge found that this issue was dispositive: "As a longstanding qualification on the commercial sale of arms under [*Heller*], a ten-day waiting period is presumptively lawful." *Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016) (Thomas, C.J., concurring). Chief Judge Thomas noted that "[o]n its face, California's waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling off' period—as a prerequisite to acquiring a gun." *Id.* at 830.[2] The same is true here: once it takes effect, Colorado's shorter three-day waiting period will operate as a condition or qualification on the sale of guns.

Second, the Act exempts non-commercial transactions from the waiting period. The law applies only to those who "sell[] a firearm." Ex. 1, § 2 (§ 18-12-115(1)(a)). It does not apply to

---

[2] The Ninth Circuit panel upheld California's waiting period law under the intermediate scrutiny standard courts applied before *Bruen*, after "assum[ing], without deciding, that the regulation . . . is not the type of regulation that must be considered presumptively valid." *Id.* at 826-27.

anyone who doesn't sell a firearm. It also expressly exempts a "firearm transfer for which a background check is not required pursuant to state or federal law," *id.* (§ 18-12-115(2)(c)), which includes:

- A bona fide gift between immediate family members (§ 18-12-112(6)(b));

- An intestate transfer or transfer through a will (§ 18-12-112(6)(c));

- A temporary transfer in the transferee's home if needed for self-protection (§ 18-12-112(6)(d));

- A temporary transfer while hunting (§ 18-12-112(6)(e)(III));

- A temporary transfer of up to 72 hours (§ 18-12-112(6)(h)).

The Act thus does not implicate an individual's right to keep and bear arms and is instead a presumptively lawful "condition[] and qualification[] on the commercial sale of arms." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27).

### C.     Even if the Act implicated Plaintiffs' Second Amendment interests, it is consistent with the Nation's historical tradition of firearm regulation and so is constitutional.

Because "the plain text of the Second Amendment does not cover" the waiting period on sellers imposed by the Act, "the government need not provide historical evidence that the regulation is consistent with the Nation's history of firearms regulation." *Tilotta*, 2022 WL 3924282, at *6. If, however, the Court proceeds to the second step of *Bruen*, Plaintiffs are not substantially likely to succeed on their challenge because Colorado's waiting period law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

To meet its burden, the government does not need to identify a historic law that is a "dead ringer." *Id*. at 2133.  Due to "unprecedented societal concerns" and "dramatic technological

changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Instead, the Governor must demonstrate only that the Act has "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133.

The United States has a long history of firearms regulation targeted at "prevent[ing] impulsive acts of firearm violence." Ex. 1, § 1(2)(a). Specifically, States have long regulated the possession, use, and sales of arms to intoxicated persons, laws which are designed to avoid such impulsive violence. As far back as 1655, Virginia made it an offense to "shoot any guns at drinking." Ex. 2, Part 1 (1655 Va. Acts 401, Act XII).[3] Much of the firearms regulation of the Revolutionary era focused on militias, and states frequently imposed limitations on the availability of alcohol near armed militiamen to avoid impulsive violence by armed men. *See, e.g.*, *id.*, Part 2 (An Act for Establishing a Militia in this Government (Del., 1756) (barring officers from holding company meetings within "half a mile of any Inn or Tavern")); *id.*, Part 3 (An Act for Regulating the Militia of the Province of Maryland (Md. Gen. Assembly, L.H.J. Liber No. 48, May 22, 1756) (barring the sale of liquor near militia training grounds)).

In the 19th century, some laws barred the sales of firearms to intoxicated persons. *See id.*, Part 4 (1878 Gen. Laws Miss. 175 ("[I]t shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any [concealable] weapon . . . , or any pistol cartridge.")). Other jurisdictions went even farther and banned not just the sale but the carrying of firearms while intoxicated, directly implicating the right to "bear

---

[3] For the Court's convenience, the Governor attaches the historic laws cited in this brief as a single exhibit, Exhibit 2.

arms." *See, e.g.*, *id.*, Part 5 (2 Gen. Stats. Of Kan. 353 (1897) ("[A]ny person under the influence of intoxicating drink . . . who shall be found within the limits of this state carrying on his person a pistol, bowie knife, dirk, or other deadly weapon, shall be subject to arrest[.]")); *id.*, Part 6 (1883 Mo. Laws 76 (making it a criminal offense "[i]f any person . . . shall have or carry any [kind of firearm] upon or about his person when intoxicated or under the influence of intoxicating drinks")). The Kansas law was passed in 1868, the same year the Fourteenth Amendment was ratified. *See State v. Christen*, 958 N.W.2d 746, 766 (Wis. 2021) (Hagerdon, J., concurring). "The temporal connection between this prohibition on armed intoxication and the Fourteenth Amendment's ratification is strong evidence that the Second Amendment, particularly as incorporated against the states, was not originally understood to preclude states from criminalizing armed intoxication." *Id.*

In considering these historic analogues, the Court should look at "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. The "why" for these laws targeting arms and intoxication are aimed at the same evil sought to be avoided by waiting period laws—avoiding impulsive firearm violence committed by someone not thinking clearly. As the Act states, "establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence." Ex. 1, § 1(2)(a). And the "how" of these laws are either the same as waiting period laws—targeting sales of such arms—or are even more directly targeted at the bearing of arms by making any such carrying while intoxicated a crime. Thus, while the laws around arms and intoxication are not historical twins for waiting periods, they were animated by the same rationale and are analogous.

Waiting period laws themselves have been around for 100 years. *See, e.g.*, Ex. 2, Parts 7-9 (1923 Cal. Laws 695, 696, ch. 339, §§ 2, 10; 1923 Conn. Laws 3707, ch. 252, § 7; 1923 N.D. Laws 379, ch. 266, § 10). But this does not mean that guns were available on demand to Americans in the 1790s and later. Instead, different "societal concerns" and "dramatic technical changes" made the primary justification for waiting periods—to avoid crimes of passion—largely unnecessary around the time of the nation's founding. This is for two reasons.

*First*, firearms were not universally available on demand in the 1790s due to the lack of stores and the rural nature of American life. As the Ninth Circuit recognized,

> There is, moreover, nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time. Our 18th and 19th century forebears knew nothing about electronic transmissions. Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as a part of doing business.

*Silvester*, 843 F.3d at 827. Thus, the lack of waiting period laws before the early 20th century does not show that Americans could buy and take possession of a gun whenever they wanted. Rather, it shows that such laws were unnecessary because a waiting period inherent in the acquisition of firearms already existed for many Americans. "Though delay has not always been associated with government regulation, the ability to immediately exercise Second Amendment rights has no foundation in history." *Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring).

*Second*, there was less need for a cooling off period at the time of the nation's founding because firearms were not—unlike today—the weapon of choice for homicide. Overall homicide rates were low, and only 10-15% of homicides were committed with a firearm. Ex. 3 (Dec. of R. Roth) ¶ 15. That's not surprising because the common firearms at the time were poorly suited for

a crime of passion. They were generally muzzle-loading, required a great deal of labor to load, often misfired, and could only shoot one shot without reloading. *Id.* ¶ 16. Homicide was much more frequently committed "with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives." *Id.* ¶ 17.

In short, the "impulsive acts of firearm violence" the Act seeks to prevent were not a societal problem at the founding. Ex. 1, § 1(2)(a). Today, by contrast, firearms are among the five leading causes of death for people between the ages of 1 and 44 and Colorado's suicide rate ranks seventh in the country. *Id.* § 1(1)(a), (c). To the extent that firearms were used in impulsive violent crimes, the practical limitations on the availability of firearms for purchase and the ability of America's rural population to immediately access those firearms made the risk that someone would run out and purchase a gun in a fit of anger minimal. Considered together, these factors make it unsurprising that waiting period laws did not exist. Rather, "unprecedented societal concerns" and "dramatic technological changes" prompted States to adopt waiting period laws beginning 100 years ago. *Bruen*, 142 S. Ct. at 2132.

## II.    Plaintiffs will not suffer irreparable harm without an injunction.

Plaintiffs' motion also fails because they cannot show irreparable harm in the absence of an injunction. "To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted). Plaintiffs must show that "the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id*. (quotations omitted).

Plaintiffs assert that "showing of the infringement of a constitutional right" satisfies their burden "of showing irreparable injury." Doc. 10 at 6. But Plaintiffs must first make it "clear []

that [constitutional] interests were either threatened or in fact being impaired at the time relief was sought." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). They cannot do so, for three reasons.

First, Plaintiff Garcia alleges a "present intention and desire to lawfully purchase a firearm" without any delay. Doc. 10-2, ¶ 2; *see also* Doc. 10-1, ¶ 4 (same, for Brown). She can do so right now—the law doesn't take effect until October.

Second, for all the reasons given above, the Act does not burden Plaintiffs' right to "keep and bear arms." *See Free the Nipple*, 916 F.3d at 806 (in constitutional claims, the irreparable injury and likelihood-of-success factors largely collapse). That right has never been understood to confer an immediate right to acquire arms.

Third, the temporary delay in acquiring a firearm does not constitute irreparable injury.[4] By its very nature, Plaintiffs' alleged harm is reparable: once the law takes effect, they can acquire guns in three days. "The Supreme Court has permitted waiting periods of varying duration in several other constitutional contexts, including before obtaining a marriage license, and permits for gathering to protest or parade." *Silvester*, 843 F.3d at 832 (Thomas, C.J., concurring). And while the right to keep and bear arms "is not a second-class right," *Bruen*, 142 S. Ct. at 2156, neither is it uniquely immune from reasonable delays.

### III.    The public interest favors public safety over Plaintiffs' desire for guns on demand.

Finally, the public interest favors denying the preliminary injunction. For one, Colorado's elected officials are in a better position than Plaintiffs or this Court to determine the public

---

[4] The Governor reserves the right to challenge whether it even constitutes injury-in-fact for purposes of Article III standing.

interest. *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) ("our democratically elected representatives are in a better position than this Court to determine the public interest").

More fundamentally, there is an overwhelming public interest in preventing gun deaths. Colorado's elected officials, relying on social science data, passed the Act to address this scourge. Colorado is experiencing increasing rates of firearm homicides and high levels of firearm suicides. Ex. 1 § 1(1). More people die in Colorado from firearms than from car crashes or opioid overdoses. *Id.* One study has found that mandatory waiting periods have led to a 7-11% reduction in firearm suicides and a 17% reduction in firearm homicides. *Id.*; *see also* Michael Luca, et al., *Handgun Waiting Periods Reduce Gun Deaths*, 46 Proc. of the Nat'l Acad. of Sci. 114 (2017). A comparable effect in Colorado would save more than a hundred lives annually. Plaintiffs would ignore this data and the will of Colorado's voters, based on a preliminary record without discovery. The interest of the public is adamantly to the contrary.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Dated: June 29, 2023            PHILIP J. WEISER
                               Attorney General

                               */s/ Michael T. Kotlarczyk*
                               *Grant T. Sullivan*, Assistant Solicitor General
                               *Michael T. Kotlarczyk*, Senior Assistant Attorney General
                               *Matthew J. Worthington*, Assistant Attorney General
                               1300 Broadway, Denver, CO 80203
                               Telephone: (720) 508-6152
                               Email: grant.sullivan@coag.gov;
                               mike.kotlarczyk@coag.gov; matt.worthington@coag.gov

                               *Attorneys for Defendant Jared Polis*
                               *Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2023, I served a true and complete copy of the foregoing **THE GOVERNOR'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DOC. 10],** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Carmen Van Pelt*