IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-1076-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

    Defendant.

---

**REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

---

Plaintiffs submit the following reply in support of their motion for preliminary injunction.

**I.  Introduction**

The State gets off on the wrong foot from the very first paragraph of its Response in which it posits that, in the Colorado legislature's opinion, waiting periods for firearm purchases promote the important governmental interest of public safety. Resp. 1. In other words, the Colorado legislature believes the means it has chosen (an arbitrary waiting period for the acquisition of firearms by laws abiding citizens) promotes an important end (public safety). This is a peculiar way to start a Second Amendment brief, because even if this Court agrees with the Colorado legislature's means-end analysis, that analysis is completely irrelevant to the resolution of

1

Plaintiffs' Second Amendment challenge. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129 (2022) (repeatedly and emphatically rejecting means-end analysis in the Second Amendment context).

A law that burdens Second Amendment conduct is presumptively unconstitutional. *Id.*, 142 S. Ct. at 2129-30 (Constitution "presumptively protects" Second Amendment conduct). HB23-1219 is, therefore, presumptively unconstitutional. The State may, of course, attempt to rebut that presumption, but it may not do so by invoking means-end scrutiny. "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's *unqualified command*." *Id.*, 142 S. Ct. at 2126 (internal citation marks and citation omitted; emphasis added).

This is a very easy case. As discussed below, the State practically admits there is no Founding era analogue to waiting period laws. Resp. 12 (first waiting period law enacted in 1923). And laws first enacted in the 20th century do "not provide insight into the meaning of the Second Amendment." *Id*. 142 S. Ct. at 2154, n. 28. The State has, therefore, no hope of carrying its burden to justify its regulation by demonstrating that it is consistent with Founding era precedent. It follows that it cannot rebut the presumption of unconstitutionality.

Imposing an arbitrary waiting period on a law-abiding citizen's exercise of her Second Amendment rights is extremely problematic, as the case of *Caetano v. Massachusetts*, 577 U.S. 411 (2016), demonstrates beyond any reasonable doubt. Jaime Caetano's abusive ex-boyfriend put her in the hospital, after which she found herself homeless and in fear for her life. *Id.*, 577 U.S. at 412–13 (Alito, J., concurring). Multiple restraining orders against the ex-boyfriend proved futile, so Ms. Caetano acquired a stun gun for protection. *Id.* It is a good thing she did, because one night after she left work, the ex-boyfriend – who towered over her by nearly a foot and outweighed her by 100 pounds – was waiting for her. *Id.* Fortunately for Ms. Caetano, the Second Amendment is a great equalizer for women. She did not need physical strength to protect herself. She stood her ground, displayed the stun gun and announced: "I'm not gonna take this anymore. I don't wanna have to [use this stun gun] on you, but if you don't leave me alone, I'm gonna have to." *Id.* (cleaned up). The gambit worked; the ex-boyfriend got scared and left her alone. *Id.*

When Ms. Caetano needed to defend herself from her abusive ex-boyfriend, she needed to exercise her Second Amendment rights without delay. One day later (much less three days later) might have been too late to avoid another trip to the hospital, or worse. But Plaintiffs' are not required to convince the Court they are the right side of the public policy argument to prevail on their motion. No part of this case turns on the parties' or the Court's views of the public policy debate. This is *Bruen's* central rationale:

> If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making [] difficult empirical

3

> judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable – and, elsewhere, appropriate – it is not deference that the Constitution demands here. The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. *Heller*, 554 U.S. at 635, 128 S.Ct. 2783. *It is this balance – struck by the traditions of the American people – that demands our unqualified deference.*

*Id.*, 142 S. Ct. at 2131 (emphasis added).

The balance struck by the traditions of the American people that demands this Court's unqualified deference does not include arbitrary waiting periods burdening the right of a law-abiding citizen to exercise her right to arm herself for defense against an immediate threat. Therefore, HB23-1219 is manifestly unconstitutional and should be enjoined.

## II.   HB23-1219 Implicates the Text of the Second Amendment

The State argues for the implausible proposition that the Second Amendment's plain text does not extend to the acquisition of firearms. Resp. 5. This is not correct. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The right to keep and bear arms obviously implies the right to acquire them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms."), *quoting Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011).

4

The State's own Response demonstrates why the acquisition of arms is obviously protected by the text of the Second Amendment. The State focuses on the phrase "bear Arms," Resp. 5, and it writes that the "phrase 'has a meaning that refers to carrying for a particular purpose – confrontation." *Id. quoting District of Columbia v. Heller*, 554 U.S. 570, 584 (2008). This is correct. But in its full context that passage from *Heller* completely undermines the State's position. The Court wrote:

> When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose – confrontation. In *Muscarello v. United States* in the course of analyzing the meaning of 'carries a firearm' in a federal criminal statute, Justice Ginsburg wrote that 'surely a most familiar meaning is, as the Constitution's Second Amendment indicates: 'wear, bear, or carry upon the person or in the clothing or in a pocket, *for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.*' We think that Justice Ginsburg accurately captured the natural meaning of 'bear arms.'

*Id.*, 554 U.S. at 584 (cleaned up; emphasis added).

The Second Amendment protects a citizen's right to be armed and ready for defensive action in case of conflict with another person. Ms. Caetano was able to acquire a stun gun for defensive action in case of a conflict with her ex-boyfriend. Her ability to do so may have saved her life.[1] But HB23-1219 arbitrarily makes people unarmed and unready for defensive action for three days. If it had been necessary for Ms. Caetano to wait three days to acquire her weapon, she would have been utterly defenseless against her ex-boyfriend during that period. She would have been deprived of her right to be "armed and ready for . . .defensive action."

---

[1] Ms. Caetano obtained her weapon from a friend, not from a store. *Caetano*, 577 U.S. 413. This does not affect Plaintiffs' point. Not everyone has a friend who will loan them a weapon. Most people acquire arms in the sort of commercial transactions burdened by Colorado's statute.

5

Depriving someone of their constitutional freedom "'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016), *quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The State argues that no Coloradans will be deprived of possessing weapons by HB23-1219. Resp. 6. This is obviously not true. Rather, every law-abiding Coloradan will be deprived of possessing a weapon they wish to acquire for self-defense purposes for three days. Indeed, depriving Coloradans of possession of a weapon they have acquired during this period is the whole point of the law.

This brings up another reason the State's argument is meritless. The State argues there is no constitutional right to acquire a weapon. Of course, no court has ever held there is no such right and as discussed above, several courts have held there is. But even on its own terms the State's argument fails, because HB23-1219 does not prevent Coloradans from purchasing arms. Instead, it bars Coloradans from possessing arms *they have already acquired*. C.R.S. § 18-12-115(1)(a) states that *after* title to a firearm has passed to the buyer, the buyer is not entitled to take possession of her property. Instead, the statute requires the seller to maintain possession of the buyer's property during the waiting period. *Id*. The phrase "keep arms" in the Second Amendment means "possessing arms." *Heller*, 554 U.S. at 583. Thus, because HB23-1219 prohibits Coloradans from possessing arms they have acquired, it burdens their Second Amendment right to keep arms.

The State cites *Def. Distributed v. Bonta*, 2022 WL 15524977 (C.D. Cal. 2022), for the proposition that the text of the Second Amendment does not imply a right to

6

purchase arms. Resp. 7. That is not what that case says. In *Def. Distributed*, the Plaintiffs challenged a California law prohibiting the possession of certain milling machines. The court held that the text of the Second Amendment did not extend to possession of those machines. *Id.* at *4. The case has nothing to do with the acquisition of arms (as opposed to certain machines), and the court did not hold that the text is not implicated by acquisition of arms themselves. Nor could it have. California is in the Ninth Circuit, and the Ninth Circuit has held on multiple occasions that the Second Amendment extends to the acquisition of arms. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) and *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014).

### III. HB23-1219 Is Not Merely a Regulation of Commercial Sales

The State argues that HB23-1219 is merely a commercial regulation as contemplated by *Heller*. Resp. 7. This is not true. As the Fourth Circuit has pointed out,

> [a] condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records. . . . Here, though, the restrictions operate as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms.

*Hirschfeld v. BATFE*, 5 F.4th 407, 416 (4th Cir. 2021), *vacated as moot*, 34 F.4th 14 F.4th 322 (emphasis in original). Similarly in this case, HB23-1219 prohibits a buyer from possessing a gun they have purchased from a licensed dealer that has met all of the required conditions and qualifications of selling the gun.

7

The State also argues that the law applies only to sellers and does not "implicate an individual's right to possession." Resp. 8. As explained above, this argument fails on its face. The whole purpose of HB23-1219 is to deprive a buyer of possession of her property during the three-day waiting period. Moreover, nothing in the law suggests that its purpose is to regulate the commercial activity of sellers. Just the opposite is true. The purpose of the law is to regulate buyers, not sellers. This is obvious from the preamble of HB23-1219, in which the General Assembly made a number of findings concerning gun violence by gun *purchasers*. It made no findings concerning gun sellers. Indeed, the legislature explicitly stated its purpose in enacting the law. It stated: "Delaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." HB23-1219, Sec. 1(2)(a). The legislature was not concerned about firearms violence by firearm sellers.[2] Thus, the statute is obviously a regulation of purchasers, not a commercial regulation of sellers. The purpose of the law is to "delay[] immediate access to firearms" by purchasers. It has nothing to do with the regulation of commercial activity of sellers.

## IV.  *Silvester* Has Been Abrogated by *Bruen*

The State cites *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), for the proposition that waiting periods are constitutional under the Second Amendment, even though it admits that *Silvester's* central holding was implicitly abrogated by *Bruen*. Resp. 8, n.2. *Silvester* assumed that the waiting period implicated the text of

---

[2] After all, it required sellers to maintain possession of the arms during the waiting period.

the Second Amendment. *Id.*, 826 F.3d at 826-27. But it nevertheless upheld the law under intermediate scrutiny because it believed the California legislature's policy objectives were reasonable. *Id.* at 829. The Court never attempted to ground its decision in the Nation's historical tradition of firearms regulation. This is exactly the sort of analysis that *Bruen* repeatedly and emphatically rejected. It is unclear why the State believes *Silvester* is even relevant authority, much less persuasive authority.

## V. "Obliterate" and "Infringe" Do Not Mean the Same Thing

The State argues that Plaintiffs' Second Amendment rights have not been infringed because the law does not apply to all arms transfers. Resp. 9. The point of the State's argument seems to be that unless it completely obliterates a person's Second Amendment rights, it has not even infringed on those rights. This is not correct. *Bruen* did not require a law to completely obliterate the Second Amendment right to implicate the text. Instead, the Court asked only whether the Second Amendment's text covered "carrying handguns publicly for self- defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S Ct. 2111, 2134 (2022). Thus, even though New York did not completely bar the practice but instead subjected it to a discretionary licensing regime, the text was nevertheless implicated. In this case, the waiting period does not apply to all avenues for the acquisition of firearms, only the most important one – purchase from a commercial gun seller. This burden on Plaintiffs' right to keep and bear arms certainly implicates the text of the Second

Amendment. *Cf. Heller*, 554 U.S. at 629 (leaving options open in one area "is no answer" to closing them in another).

## VI. The Founders Knew About Impulsive Gun Violence

Because the text of the Second Amendment covers Plaintiffs' conduct, HB23-1219 is presumptively unconstitutional. *Bruen*, 142 S. Ct. at 2129-30. The burden shifts to the State to attempt to rebut that presumption by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id.* "In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. In *Heller*, D.C.'s flat ban on the possession of handguns was a regulation the Founders themselves could have adopted to confront the social problem D.C. identified, i.e. handgun violence in urban areas. *Bruen*, 142 S. Ct. at 2131. And since none of the founding era regulations identified by D.C. was analogous to its ban, the ban was unconstitutional.

In this case, the State has identified impulsive gun violence as the problem it seeks to address. HB23-1219, Sec. 1(2)(a). But the problem of impulsive gun violence dates from the invention of guns, and the Founders themselves could have adopted regulations to confront this problem. Thus, HB23-1219 addresses a general societal problem that has persisted since long before the 18th century. The State admits there were no waiting periods in the Founding era. Resp. 12. And that lack

10

of a distinctly similar Founding era regulation addressing a problem that was familiar to the Founders means HB23-1219 is "inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

### VII. HB23-1219 Applies *only* to Law-Abiding Citizens

The Second Amendment "elevates above all other interests" the right of law-abiding citizens to use arms for self-defense. *Bruen*, 142 S. Ct. at 2131. Because of this, HB23-1219 is particularly suspect because, by definition, it burdens the rights of *only* law-abiding citizens. The law states that a firearms seller may not deliver an arm to a buyer until three days after the buyer has passed a background check. C.R.S. § 18-12-115(1)(a). In other words, the waiting period applies only after the buyer has already proved they are a law-abiding citizen.

### VIII. The State's Historical Analysis Fails

The State begins its historical analysis by arguing that historical regulations relating to intoxicated persons are analogous to a law that prohibits every buyer from obtaining possession of their firearm even when no reason for doing so has been identified. *Bruen* points to two metrics that are important in determining whether a historical regulation is analogous to a challenged regulation. Those are the "how and why of the regulations." *Id.*, 142 S. Ct. at 2133. The State's reliance on regulations of intoxicated person manifestly fails the "why" metric. Regulations of intoxicated persons are justified because those persons are obviously a danger to themselves and to others. That is the "why" justifying the regulations. But HB23-1219 deprives everyone of the possession of arms they have acquired without any

11

inquiry, much resolution, of the question of whether a particular person poses a threat to anyone. Indeed, as noted above, every person to whom HB23-1219 applies has passed a background check and is therefore presumably not a threat to anyone. That is, after all, the purpose of background checks. Thus, regulations of intoxicated persons are of no relevance in this case.

In *United States v. Connelly*, 2023 WL 2806324 (W.D. Tex. 2023), the plaintiffs challenged a statute that prohibited users of intoxicants from possessing firearms (even when they were not actually intoxicated). The court held the law violated the plaintiffs' Second Amendment rights. In doing so, the court rejected many of the proposed analogues advanced the State in this case. The court held the laws were not analogous because the historical laws prevented individuals from using firearms while actively intoxicated, while the challenged statute prevented users of intoxicants from possessing firearms altogether. *Id.*, *7. The court held that prohibiting someone who has used drugs in the last year from keeping arms for self-defense is not analogous to preventing people from shooting their guns while intoxicated. *Id*. A fortiori, a law that prevents law-abiding citizens who have done nothing wrong from possessing the arms they have acquired is not analogous to a law that bans people from shooting guns while intoxicated.

The State argues that the intoxicated person laws are analogous to HB23-1219 because the statute prevents impulsive firearms violence by "someone not thinking clearly." Resp. 11. If HB23-1219 were limited to firearm purchasers for whom there was some reason to believe they might not be thinking clearly, the

12

State might have a point. But is not. Instead, with respect to the overwhelming number of law-abiding citizens affected by HB23-1219, there will be no reason to think they are impaired at all. Thus, a law specifically targeted at an obviously dangerous situation is not analogous to a law that sweeps up everyone, including a teetotaler who has never had a drink in her life. The laws identified by the State banned selling arms to obviously intoxicated persons. If HB23-1219 imposed a waiting period on sales to obviously intoxicated persons, it would be analogous to those historical laws. It does not, and for that reason it is not analogous to the historical laws identified by the state.

## IX. Practical Impediments to Firearm Delivery Are Not the Same as Legal Impediments

The State cites *Silvester's* observation that in colonial days practical transportation issues sometimes imposed delays on the delivery of firearms. Resp. 12. The point of this observation is unclear. As *Silvester* itself noted, these delays were not caused by government regulations. 843 F.3d at 827. Thus, the practical delays were not analogous to HB23-1219.

## X. The Other Preliminary Injunction Factors Favor Plaintiffs

The State argues that because the law is not effective until October 1, 2023, the Plaintiffs are not at this moment entitled to a preliminary injunction. Resp. 14. Plaintiffs do not disagree, as they explained in their motion (Mot. 1). Plaintiffs filed their motion prior to the effective date of the statute so that the issues would be fully briefed prior to that date so that the Court would be able to proceed in a more deliberative fashion rather than all at once on October 1. Obviously, Plaintiffs will

13

require an injunction to vindicate their constitutional rights when the statute does become effective. The point of the State's argument is thus unclear.

Finally, the State makes one last run at interest balancing under the guise of its "equities" and "public interest" analysis. For the reasons set forth above, the State's interest balancing argument is no more successful in this section of its brief than it was in the earlier section.

HB23-1219 is an innovation. In the 147 years from August 1, 1876, to August 8, 2023, no such law has appeared in Colorado's statute books. Plaintiffs do not seek to overturn a longstanding statutory settlement. Instead, they seek to prevent a newly enacted law that infringes on their constitutional rights from becoming effective in the first place. "The main purpose of a preliminary injunction is simply to preserve the status quo pending the outcome of the case." *Vreeland v. Huss*, 2021 WL 4544077, at *1 (10th Cir. Oct. 5, 2021), *quoting Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986). Plaintiffs request the Court to ender an order maintaining that status quo while this case is pending.

### IV. Conclusion

For the foregoing reasons, Plaintiffs respectfully request the Court to enter an order preliminarily enjoining HB23-1219.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington